DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LAUREL KELLY**, as Martin County Property Appraiser, and **RUTH PIETRUSZEWSKI,** as Martin County Tax Collector,
Appellants,

v.

**MARY JANE SPAIN,**
Appellee.

No. 4D14-510

[February 25, 2015]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Lawrence M. Mirman, Judge; L.T. Case No. 432013CA000767.

Gaylord A. Wood, Jr., and J. Christopher Woolsey of Law Offices of Wood & Stuart, P.A., Bunnell, for appellants.

Donald H. Whittemore of Phelps Dunbar LLP, Tampa, for appellee.

GROSS, J.

Does a homestead exemption originally obtained by a husband alone inure to his wife's benefit after his death, where (1) the property was held as a tenancy by the entireties, (2) the wife never filed for her own homestead exemption, and (3) the wife continuously maintained her permanent residence on the property before and after her husband's death? Under Article VII of the Florida Constitution and statutes implementing the Constitution's homestead provisions, we answer the question in the affirmative.

The facts of this case are not in dispute. In 1985, Frank Spain applied for and received a homestead exemption for the house he owned in his name on South Beach Road in Hobe Sound. After receiving the exemption, he married appellee Mary Jane Spain in April 1985. From that time, the couple resided at the house as their primary residence for the remainder of their marriage. On February 24, 2000, Frank conveyed the house via warranty deed to himself and Mary Jane, as tenants by the entireties.

After this conveyance, Mary Jane did not apply for her own homestead exemption. The couple received property tax bills in both their names, consistent with the entireties ownership, and continued to receive the homestead exemption. Frank died on April 25, 2006. Mary Jane continued to occupy the house as her primary residence. She did not apply for a homestead exemption in her name after Frank's death, nor did she notify the Property Appraiser of his demise.

From 2007 through 2011, the Martin County Property Appraiser continued to apply the homestead exemption's tax benefits and the "Save Our Homes" assessment cap to the home and sent notices of proposed taxes to "Frank K. Spain and Mary Jane Spain"; likewise, the Tax Collector sent tax notices addressed to "Frank K. Spain and Mary Jane Spain."

In May 2012, the Property Appraiser learned of Frank's death from the filing of an Order of Summary Administration. This probate filing was the Property Appraiser's first notice that Frank had died in 2006.

Two months later, the Property Appraiser sent Mary Jane a letter informing her that a $283,070.45 tax lien had been placed on her home. The amount of the lien was based on the total taxes erroneously exempted from 2007 through 2011, including a 50% penalty and 15% interest per year. To justify the notice of tax lien, a compliance officer in the Property Appraiser's office explained:

> We recently received notice, as a result of a probate recording . . . that Frank K. Spain died on 4/25/2006. [The h]omestead exception on this account was based on Frank K. Spain's homestead application he filed in 1985 and was contingent upon his continued residency on this property in Florida. Mr. Spain was the only owner who filed an application for the homestead exemption.

> Since we were unaware that Mr. Spain died in 2006 we have continued to automatically renew his homestead exemption each year. [The h]omestead exemption should have ended as of 12/31/06 as a result of his death in April 2006.

### Procedural Posture

Mary Jane satisfied the tax lien under protest and filed suit against Martin County's Property Appraiser and Tax Collector ("the appellants"), seeking two forms of declaratory relief: first, a "finding that, following her husband's death in 2006, [Mary Jane] was entitled to the benefit of the homestead exemption and the limitation of reassessments of her [home] as provided by law"; and, second, "a refund from the Tax Collector of the amount of the 2012 property taxes paid in excess of the taxes due had the

homestead exemption not been revoked by the Property Appraiser." Relying upon section 193.155(3)(a), Florida Statutes (2011), which comprises part of the "Save Our Homes" amendment's implementing statute, Mary Jane argued her husband's "death did not constitute a change of ownership of the [home] that triggered the requirement to reassess the [home] at just value." Rather, Mary Jane interpreted section 193.155(3)(a) *in pari materia* with section 196.011, Florida Statutes (2011)—the homestead exemption's implementing statute—as mandating that "there is no change of ownership where subsequent to the change, the same person is entitled to the homestead exemption and the transfer is made between spouses or to a surviving spouse."

In their answer, the appellants contended that Mary Jane waived the homestead exemption benefits from 2007 through 2011 by failing to file a homestead application in her name. The appellants viewed the death of Frank, "the co-owner of the property who was the only applicant for [the H]omestead Exemption," as "a change in 'the status or condition of the owner'" contemplated by section 196.011(9)(a), Florida Statutes (2011), requiring Mary Jane to "notify the Martin County Property Appraiser of that fact." Because she failed to do so, the appellants claimed the lien was proper.

The circuit court granted summary final judgment in favor of Mary Jane and ordered the Tax Collector to refund $283,070.45 to her, with interest.

### Standard of Review

"Statutory and constitutional construction are questions of law subject to a de novo review." *W. Fla. Reg'l Med. Ctr., Inc. v. See*, 79 So. 3d 1, 8 (Fla. 2012). "When reviewing constitutional provisions, this Court follows principles parallel to those of statutory interpretation." *Ford v. Browning*, 992 So. 2d 132, 136 (Fla. 2008) (internal quotation omitted). Accordingly, "[i]f the language in the constitution is clear, there is no need to resort to other tools of construction." *Garcia v. Andonie*, 101 So. 3d 339, 343 (Fla. 2012) (citing *Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So. 2d 503, 510 (Fla. 2008)). If, on the other hand, "the explicit language is ambiguous or does not address the exact issue before the court, the court must endeavor to construe the constitutional provision in a manner consistent with the intent of the framers and the voters." *Ford*, 992 So. 2d at 136 (citing *Crist v. Fla. Ass'n of Criminal Defense Lawyers, Inc.*, 978 So. 2d 134, 140 (Fla. 2008)).

### Homestead and the "Save Our Homes" Assessment Cap

"The law of homestead began as an 'American innovation' that was incorporated into Florida's jurisprudence where it evolved, relative to the

homestead laws of other jurisdictions, into a rather unique body of rules and principles." *Traeger v. Credit First Nat'l Ass'n*, 864 So. 2d 1188, 1190 (Fla. 5th DCA 2004) (citation omitted). From this transformation, homestead has been given meaning in three different contexts—taxation, exemption from forced sale, and devise and descent—lending itself to its title as our state's "legal chameleon."[1] *See Snyder v. Davis*, 699 So. 2d 999, 1001-02 (Fla. 1997); *Phillips v. Hirshon*, 958 So. 2d 425, 427 (Fla. 3d DCA 2007).

No matter the form, the goal of homestead has remained stable: to protect the family. *See Chames v. DeMayo*, 972 So. 2d 850, 856 (Fla. 2007). Homestead "'promote[s] the stability and welfare of the state by securing to the householder a home, so that the homeowner and his or her heirs may live beyond the reach of financial misfortune." *McKean v. Warburton*, 919 So. 2d 341, 344 (Fla. 2005) (quoting *Pub. Health & Trust v. Lopez*, 531 So. 2d 946, 948 (Fla. 1988)). Those aspects of homestead directed at property taxation provide financial relief for owners of property who qualify for homestead status.

Article VII, Section 6(a) of the Florida Constitution allows "[e]very person who has the legal or equitable title to real estate and maintains thereon the permanent resident of the owner, or another legally or naturally dependent upon the owner," to claim a homestead tax exemption. For real property to qualify for a homestead exemption, an applicant must make three showings: (1) that the real property is owned by a "natural person"; (2) that the owner has "made, or intend[s] to make the real property his or her permanent residence or that of his family"; and (3) that "the property . . . meet[s] the size and contiguity requirements of article X, section 4(a)(1) of the Florida Constitution." *Aronson v. Aronson*, 81 So. 3d 515, 518 n.2 (Fla. 3d DCA 2012) (citing *Cutler v. Cutler*, 994 So.

---

[1]The moniker arises from Harold B. Crosby and George John Miller's law review article *Our Legal Chameleon, the Florida Homestead Exemption: I-III*, 2 U. Fla. L. Rev. 12 (1949), in which they stated:

> At times, . . . separate and distinct chameleons, one of one size and one of another, perch on a single object. Thanks to the early draftsmen in this field, who, if they did not write too well, at least refrained from writing too much, and to a Supreme Court that for decades has shown a high degree of sound common sense and logical consistency in the interpretation of most of the homestead provisions, there exist today definite contours that remain distinguishable amid the camouflage of varying factual situations.

*Id.* at 13.

2d 341, 344 (Fla. 3d DCA 2008)). Once the homestead exemption is granted, the homeowner is not required—county permitting—to submit a renewal application each year unless there has been change affecting the property's homestead status. *See Mastroianni v. Mem'l Med. Ctr. of Jacksonville, Inc.*, 606 So. 2d 759, 761-62 (Fla. 1st DCA 1992). Section 196.011(9)(a), Florida Statutes (2011), sets forth the circumstances when a reapplication for homestead status is required even where a county "waiver" exists:

> A county may, at the request of the property appraiser and by a majority vote of its governing body, waive the requirement that an annual application or statement be made for exemption of property within the county after an initial application is made and the exemption granted. . . . **Notwithstanding such waiver, refiling of an application or statement shall be required when any property granted an exemption is sold or otherwise disposed of, when the ownership changes in any manner, when the applicant for homestead exemption ceases to use the property as his or her homestead, or when the status of the owner changes so as to change the exempt status of the property.**

(Emphasis added).

Among the benefits inhering in homestead status is the tax break afforded by article VII, Section 4(d) of the Florida Constitution, popularly known as the "Save Our Homes" amendment. *Lanning v. Pilcher*, 16 So. 3d 294, 296 (Fla. 1st DCA 2009). The amendment "took its place in the Florida Constitution after the voters of this State approved a citizens' initiative on November 3, 1992," *Zingale v. Powell*, 885 So. 2d 277, 280 (Fla. 2004), with the purpose of "encourag[ing] the preservation of homestead property in the face of ever increasing opportunities for real estate development, and rising property values and assessments." *Smith v. Welton*, 710 So. 2d 135, 137 (Fla. 1st DCA 1998) (footnote omitted). It serves this goal by "limit[ing] the annual change in property tax assessments on homestead exempt property to three percent of the previous assessment or the change in the Consumer Price Index, whichever is less."[2] *Vega v. Robbins*, No. 03-23953 CA 30, 2006 WL 779734, at *1 (Fla. 11th Cir. Ct. Mar. 17, 2006).

---

[2]The "Save Our Homes" Amendment provides, in pertinent part:

As explained by the Supreme Court in *Zingale*, the Article VII, Section 4(d) "Save Our Homes" assessment cap interlocks with the Article VII, Section 6 homestead; "both provisions are parts of a coordinated constitutional scheme relating to taxation and have as their underlying purpose the protection and preservation of homestead property." 885 So. 2d at 285. The "Save Our Homes" protection is available only to those who have applied for and received a section 6 homestead exemption. *Id.*

### After her husband's death, Mary Jane was entitled to continue to enjoy the homestead exemption because she continued to occupy the home as her primary residence

The appellants argue that after her husband's death, Mary Jane was not entitled to the waiver of the homestead renewal procedures provided in section 196.011(9)(a) because the ownership of her home had "change[d] in any manner" within the meaning of that section, thus requiring her to file a new homestead application. However, as Mary Jane argues, there was no such change of ownership that triggered the need for a new application. Section 196.011 must be read *in pari materia* with the "Save Our Homes" amendment's implementing statute—section 193.155, Florida Statutes (2011)—which expressly provides that there is no change in ownership when there is a transfer of homestead property to one spouse upon the death of the other.

In *Zingale,* the Supreme Court concluded that subsection 4(d)[3] and section 6 of Article VII "should be read *in pari materia*." 885 So. 2d at 285. If the constitutional provisions are to be construed together, it follows that statutes implementing the same provisions are also "construed together to harmonize the statutes and to give effect to the Legislature's intent." *Fla. Dep't of State, Div. of Elections v. Martin,* 916 So. 2d 763, 768 (Fla. 2005).

---

(1) Assessments subject to this subsection shall be changed annually on January 1st of each year; but those changes in assessments shall not exceed the lower of the following:

a. Three percent (3%) of the assessment for the prior year.

b. The percent change in the Consumer Price Index for all urban consumers, U.S. City Average, all items 1967=100, or successor reports for the preceding calendar year as initially reported by the United States Department of Labor, Bureau of Labor Statistics.

Art. VII, § 4(d), Fla. Const.

[3] At the time, the "Save Our Homes" amended was codified in section 4(c).

"[T]he fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it." *Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1063 (Fla. 2010) (citation and quotations omitted).

Sections 196.011 and 193.155 both implement the constitutional provisions concerning the taxation of homestead properties. As previously noted, section 196.011(9)(a)'s homestead renewal procedure mandates the re-filing of a homestead application "when any property granted an exemption is sold or otherwise disposed of, when the ownership changes in any manner, when the applicant for homestead exemption ceases to use the property as his or her homestead, or when the status of the owner changes so as to change the exempt status of the property." While section 196.011 fails to define the term "ownership change," section 193.155(3)(a), which pertains to assessment caps under the "Save Our Homes" amendment, fills this void by stating:

> (3)(a) Except as provided in this subsection or subsection (8), property assessed under this section shall be assessed at just value as of January 1 of the year following a change of ownership. Thereafter, the annual changes in the assessed value of the property are subject to the limitations in subsections (1) and (2). For the purpose of this section, a change of ownership means any sale, foreclosure, or transfer of legal title or beneficial title in equity to any person, except as provided in this subsection. **There is no change of ownership if:**
>
> . . .
>
> > 2. **Legal or equitable title is changed or transferred between husband and wife, including a change or transfer to a surviving spouse** or a transfer due to a dissolution of marriage . . . .[4]

(Emphasis added). As referenced within subsection 193.155(3)(a), which deals with the establishment of a new homestead, the statute's subsection (8) provides that a husband or wife have the benefit of a single homestead application filed by only one of them:

---

[4]The statute also provides that there is no change of ownership if a "transfer occurs by operation of law to the surviving spouse or minor child or children under s. 732.401" or if "[u]pon the death of the owner, the transfer is between the owner and another who is a permanent resident and is legally or naturally dependent upon the owner." § 193.155(3)(a)3., 4., Fla. Stat. (2011).

> For purposes of this subsection, a husband and wife who owned and both permanently resided on a previous homestead shall each be considered to have received the homestead exemption **even though only the husband or the wife applied for the homestead exemption on the previous homestead.**

§ 193.155(8), Fla. Stat. (2011) (emphasis added).

Reading sections 196.011 and 193.155 together leads to two conclusions. First, a homestead application filed by one spouse inures to the other spouse, provided both spouses permanently resided at the homestead. Second, the transfer of homestead property between a wife and husband through the operation of survivorship does not constitute a change of ownership under section 196.011(9)(a). To interpret otherwise would create a conundrum, where a surviving spouse would qualify for renewal of the "Save Our Homes" assessment cap but not for renewal of the homestead exception. Such a result is not consistent with the homestead exemption's purpose of shielding Floridians from undue financial hardship related to a home after a person has experienced one of life's most stressful events, the death of a spouse.

The appellants also focus on the language in section 196.011(9)(a) indicating that refiling of an application is required when the "applicant for homestead exemption ceases to use the property as his . . . homestead." Obviously, Frank's death meant that he ceased to "use" the property. However, this approach fails to take into account that section 196.011 allows an "applicant" to apply for a homestead exemption on behalf of a spouse. *See* § 196.011(1)(b), Fla. Stat. (2013). We therefore read "applicant" as including **both** spouses who own a property as tenants by the entirety. This reading is reinforced by treatment accorded spouses in subsections 193.155(3) and (8). The "cease to use" provision of section 196.011(9)(a) applies when both spouses cease to use the property as their homestead.

The notion that there was not a change of ownership or use in this case that triggered the requirement of a new homestead application is strengthened by the characteristics of the tenancy by entireties form of ownership which the Spains utilized. In a tenancy by the entireties, the "husband and wife hold the property 'per tout,' such that both are treated as one person and neither spouse can sell, forfeit, or encumber any part of the estate without the consent of the other." *Romano v. Olshen*, Nos. 4D12-451, 4D12-2466, 4D13-1083, 2014 WL 940700, at *8 (Fla. 4th DCA Mar. 12, 2014) (internal quotations omitted). "[E]ach spouse's interest comprises the whole or entirety of the property and not a divisible part;

the estate is inseverable." *United States v. One Single Family Residence With Out Buildings Located at 15621 S.W. 209th Ave., Miami, Fla.*, 894 F.2d 1511, 1514 (11th Cir. 1990) (citations omitted) (applying Florida law). "When one of the tenants by the entirety dies, the surviving tenant receives no new or greater estate than already possessed, but the interest of the deceased tenant ceases." *Lopez v. Lopez*, 90 So. 2d 456, 458 (Fla. 1956). Because Mary Jane owned no more or less of the property after her husband died, and because entireties law viewed them as one owner, neither the ownership of the property nor Mary Jane's use of it "changed" within the meaning of section 196.011(9)(a).

The rule created by reading the Constitution and applicable statutes together is that where a husband and wife occupy a homestead and where one of the spouses properly applied for and obtained a homestead exemption, the death of one spouse will not destroy the homestead exemption of the other so long as the survivor continues to use the homestead as his or her permanent residence.

The appellants suggest that this holding would open a Pandora's box of evils. They point out that allowing surviving spouses to continue to enjoy the benefits of the deceased spouses' homestead applications would place property appraisers in the impossible position of "guess[ing] which surviving spouses of homestead exemption recipients might wish to have the homestead exemption applied to them, assuming that they are also permanent residents, entitled to homestead exemptions in the first place." We do not see that these concerns are different than those related to any homestead owner facing renewal—an owner is required to file an honest renewal application under section 196.011(6)(a) or refile an application if required under section 196.011(9)(a). Similar to any taxation statute, homestead law requires people to act honestly, to tell the truth, or suffer the legal consequences. If Mary Jane had not been using the home as her primary residence after her husband's death she would have been required to report that fact pursuant to section 196.011(9)(a) or suffer the interest and penalty provisions of that section. It is a great injustice to take a surviving spouse who, after her husband's death, continues to properly enjoy the homestead classification and treat her as a scofflaw by imposing a 50% penalty of the taxes exempted plus 15% interest on what is purportedly owed.

For these reasons we affirm the final summary judgment.

TAYLOR and LEVINE, JJ., concur.

\*        \*        \*

*Not final until disposition of timely filed motion for rehearing.*